**James CRANDELL**

v.

**Burl CAIN, Warden, Louisiana State Penitentiary**

No. CIV.A. 99–2166.

United States District Court,
W.D. Louisiana,
Shreveport Division.

Aug. 25, 2004.

---

930

James Crandell, Angola, LA, Pro se.

Randall R Robinson, Snell & Robinson, Bossier City, LA, for Plaintiff James Crandell.

Carl L Ekendahl, D A's Office 26th J D C, John M Lawrence, D A's Office 26th J D C, Benton, LA, for Defendant Warden Louisiana State Penitentiary.

## JUDGMENT

STAGG, District Judge.

For the reasons assigned in the Report and Recommendation of the Magistrate Judge previously filed herein, and having thoroughly reviewed the record, no written objections having been filed, and concurring with the findings of the Magistrate Judge under the applicable law;

**IT IS ORDERED** that the petition for writ of habeas corpus be **GRANTED** as follows. The indictment and conviction of Petitioner are hereby **VACATED** and it is ordered that Petitioner be released from custody **unless** the State, within a reasonable time, obtains a new indictment or otherwise institutes a prosecution of Petitioner arising from the facts that resulted in his initial conviction. The Warden or other custodian shall not, however, release Petitioner from custody based solely on this Judgment absent additional and specific instructions from the court.

## REPORT AND RECOMMENDATION

PAYNE, United States Magistrate Judge.

### Introduction

James Crandell ("Petitioner") was indicted by a Bossier Parish grand jury for first degree murder. The trial jury found Petitioner guilty. The jurors could not agree unanimously to impose a death sentence, so Petitioner received a mandatory life sentence. Petitioner pursued a direct appeal and a post-conviction application in the state courts. He now seeks federal habeas relief on several issues.

This court originally denied relief on all of the several claims Petitioner asserted. Among them were (1) an equal protection and due process challenge under *Campbell v. Louisiana*, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998)(white defendant has standing to challenge exclusion of blacks from grand jury foreman post) and (2) a claim that defense counsel were ineffective for failing to move to quash the indictment on that basis. The court reasoned that *Campbell*, not decided until after Petitioner's conviction was final, was a "new rule" for purposes of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) so could not be applied retroactively to this white defendant's case.

The Fifth Circuit later held that *Campbell* was not a newly recognized and retroactive rule that would delay commencement of the limitations period for the claim under 28 U.S.C. § 2244(d)(1)(C). *Peterson v. Cain*, 302 F.3d 508 (5th Cir.2002), *cert. denied*, 537 U.S. 1118, 123 S.Ct. 886, 154 L.Ed.2d 796 (2003). The rationale that doomed the prisoner in *Peterson* to untimeliness was welcome news for this Petitioner who had filed a timely petition. Given the analysis in *Peterson*, the Fifth Circuit had little choice but to vacate the portions of this court's judgment on the foreman-related issues noted above. It denied COA as to all of Petitioner's other claims. *Crandell v. Warden*, 72 Fed.Appx. 48 (5th Cir.2003); Docs. 25 and 27.

On remand, the court appointed attorney Randall Robinson to represent Petitioner. An evidentiary hearing, at which Petitioner was present, was held on March 26, 2004. Counsel submitted 12 joint exhibits and questioned Judge Graydon K. Kitchens, Jr. about the foreman selection process employed in Bossier Parish during the relevant period. After considering the evidence and law pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons that follow, it is recommended that the petition for habeas relief be granted.

### Background Facts

The charge against Petitioner stemmed from events that happened in the summer of 1989, when Petitioner, his female com-

panion, Gail Willars, and her eight-year-old son, Zachary, were staying in a Bossier City motel. According to Ms. Willars, she and Petitioner began to travel together after her husband died in a tractor accident and she collected his life insurance and other benefits. Petitioner and Willars used over $100,000 worth of cocaine during their travels and eventually landed in Room 15 at the Beacon Manor Motel. The Beacon Manor was frequented by several prostitutes. After Petitioner and Willars ran out of money and were facing eviction, Willars tried to earn some cash by prostituting herself for the first time ever. According to Willars, she thought Petitioner and young Zachary had left the motel room before she entered with her customer. But when the customer began getting rough with Willars and trying to take advantage of her lack of experience in the trade, Petitioner suddenly appeared (from a closet or the bathroom) and attacked the customer in defense of Ms. Willars.

The fight continued in multiple stages that involved knives, sticks, duct tape, four blows to the head with a frying pan, and strangulation. The customer was stuffed in a closet where he eventually died, and the tenants fled to Chicago. They told friends there that they had to kill a man and were running from the law. Petitioner and Willars were soon arrested in Chicago, where police found them with several of the victim's personal items. Police also recovered other items, such as the victim's jewelry and car, that had already been sold by Petitioner and Willars. *See State v. Crandell,* 604 So.2d 123 (La.App. 2d Cir.1992).

### Discrimination in Selection of Grand Jury Foreman

#### A. Introduction

Any defendant, no matter his race, has standing to challenge on equal protection and due process grounds the exclusion of African Americans as the foreperson of a Louisiana grand jury. *Campbell v. Louisiana,* 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998). Petitioner, who describes himself as an American Indian, complains that Bossier Parish officials failed to appoint an African American as a grand jury foreperson within 20 or more years preceding his indictment. This court has seen several similar claims that arose from parishes in this division, and it has granted relief to one African American petitioner in a case from Bossier Parish. *See Clarence Hicks v. Cain,* 97 CV 2460 (appeal filed by Warden but dismissed voluntarily).

#### B. Procedural Bar

■ The State first argues that the *Campbell* claim is procedurally barred because Petitioner did not file a timely motion to quash the indictment as required by Louisiana law. That defense is fatal to most of the foreman-discrimination claims seen by this court. *See Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Williams v. Cain,* 125 F.3d 269, 274–75 (5th Cir.1997). This Petitioner also failed to file a timely motion to quash, but his claim is not subject to a procedural bar because the last reasoned state-court decision did not rely on the bar.

■ A procedural bar serves as a defense to a federal petition only when the State court clearly and expressly relied upon the bar in its last reasoned ruling. *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 2557, 115 L.Ed.2d 640 (1991); *Foster v. Johnson,* 293 F.3d 766, 786 (5th Cir.2002). Petitioner's original post-conviction application did not challenge the indictment directly. Rather, he complained that his counsel were ineffective for failing to pursue the issue. (Tr. 1758,

1779–81) The trial judge summarily denied the application (Tr. 1337), but the State appellate court remanded and ordered the trial court to hold an evidentiary hearing and provide reasons for his decision.

The trial court heard evidence on January 30–31 and October 30 of 1995. Tr. Vol. I, pp. 179–300. During the process of the hearing and post-hearing briefing, the ineffective assistance claim was transformed into a direct challenge to the indictment. Defense counsel argued at the first hearing that the Bossier Parish foreman selection system was unconstitutional because of a history of race discrimination. (Tr. 182–86) Petitioner also filed a pro se brief after the hearing that asserted an equal protection attack on the indictment (in addition to his *Strickland* claim based on the lack of a motion to quash). (Tr. 1916–23)

After Petitioner's original post-conviction attorney died, a newly appointed attorney filed a Motion to Supplement Record (Tr.1975) that squarely presented equal protection and due process claims. The supplemental brief cited the recently decided *Campbell* decision (to support standing) and presented facts about the percentage of African Americans in the population of Bossier Parish and the persons who had filled the grand jury foreman position in the last several years. Petitioner's evidence indicated that there had not been a black foreman appointed in the 15 years before his trial, although approximately 20% of Bossier Parish citizens were black.

The district attorney filed a response that (1) challenged the equal protection and due process arguments on the merits and (2) asserted that the attacks were procedurally deficient because they were not the subject of a timely motion to quash. The trial judge wrote on the last page of the prosecutor's brief: "For the reasons stated hereinbefore, applicant's PCR application is DENIED." (Tr.2044) He did not provide any reasons of his own, despite the appellate court's earlier instruction.

Petitioner applied to the state appellate court for relief. It ruled as follows:

> This writ application is **without merit.** After conducting evidentiary hearings, held in accordance with the July 7, 1994 Order of this Court, the trial court did not err in its denial of defendant's application for post-conviction relief. The rights of the defendant were not prejudiced by the trial court's failure to provide written or transcribed reasons for its denial of the defendant's application for post-conviction relief.

(Tr.2062)(emphasis added) The Supreme Court of Louisiana denied writs without comment. (Tr.2065)

 When the final state habeas decision is silent or ambiguous, such as the writ denial in this case, the federal court must "look through" to the last clear and explained state-court decision to determine whether the adjudication was on the merits or rested on a procedural bar. *Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). It could be argued that the trial judge's adoption of the reasons in the prosecutor's memorandum relied, at least in the alternative, on the procedural bar, but his ruling was not clear or express in that sense.[1] The appellate court's decision, which is the one that controls under *Ylst,* begins by flatly reject-

---

1. A claim may be procedurally barred if the state court bases its denial of relief on a state procedural default and alternatively reaches the merits of a claim. *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, n. 10, 103 L.Ed.2d 308 (1989); *Cotton v. Cockrell,* 343 F.3d 746, 754 (5th Cir.2003).

ing the claim for lack of merit. There is no hint that the appellate court denied relief based on a procedural deficiency, and it certainly cannot be said that the State court "clearly and expressly" rested its decision on any such independent state law grounds. Accordingly, there is no ground for a procedural bar defense.

## C. A Prima Facie Case

■■■ To establish a prima facie case of discrimination in the selection of a grand jury foreman, a petitioner must demonstrate:

1. That the group against whom discrimination is asserted is a distinct class, singled out for different treatment;

2. The degree of under representation, by comparing the proportion of the group in the total population to the proportion called to serve as foremen over a significant period of time;

3. That the selection procedure is susceptible to abuse or is not racially neutral.

*Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Johnson v. Puckett,* 929 F.2d 1067, 1071–72 (5th Cir.1991). No showing of resulting prejudice is necessary. *Guice v. Fortenberry,* 661 F.2d 496, 498 n. 2 (5th Cir.1981) (en banc)("*Guice* I").

The State concedes in its post-hearing memorandum (Doc. 43, pg.4) that Petitioner has established a prima facie case. The facts underlying the prima facie case are also relevant to the State's rebuttal burden, so they will be discussed below despite the concession.

## D. Distinct Class

■■ Element one of the *Castaneda* test, distinct class, is satisfied. Louisiana and federal courts have recognized the black race as a class capable of being singled out for different treatment. *State v. Thomas,* 609 So.2d 1078, 1081 (La.App. 2d Cir.1992); *Johnson,* 929 F.2d at 1072.

## E. Under Representation

■■ The second *Castaneda* element is the degree of under representation of blacks in the foreman role. That is measured by "comparing the proportion of the group in the total population to the proportion called to serve as foremen over a *significant period of time.*" *Johnson,* 929 F.2d at 1072 (emphasis added). The relevant period may not be calculated with mathematical precision. Cases like *Johnson* and *Guice* have looked to periods of 20 and 15 years. The review of a "significant period of time" was designed by the Court to permit a petitioner to establish a prima facie case of discrimination that, absent proper rebuttal, requires relief.

■■ There is no indication the Bossier Parish selection procedure changed markedly at any time between 1965 and when Petitioner was indicted in 1989. Judge Kitchens described the foreman selection process used in Bossier Parish during his tenure between 1978 and 1996, and the parties stipulated that the procedures he described were the same general procedures employed by other judges on the court.[2] Petitioner, accordingly, advocates that the court examine the period from 1965 to his indictment in 1989. The undersigned agrees that the suggested period affords a complete and informative view of Bossier Parish's record of foreman selec-

---

**2.** Judge Burchett offered similar testimony at the hearing in the *Hicks* case. The parties in *Hicks* also stipulated that the procedure described by Judge Burchett "was the same

selection process that was done by the other judges who were contemporaries of Judge Burchett and those who preceded him, also." 97 CV 2460; Doc. 27, p. 5.

tion and the effect of its selection procedures.

This conclusion is supported by *Ray v. Cain*, 71 Fed.Appx. 442 (5th Cir.2003). In *Ray*, the Fifth Circuit reversed a district court that looked to a period that focused on post-indictment years. It noted that "cases involving discrimination in the selection of grand jury forepersons establish that the relevant time period is that leading up to the indictment in question."

Census data reflects that black citizens made up 24.71% of the Bossier Parish population in 1960. By 1970, the black population had fallen to 19.7%. It then stayed around 20% in 1980 (18.87%) and 1990 (20.19%). Exhibits 1 and 2; Doc. 42, pg. 3. Of the approximately 50 foremen selected in the 25 year period from 1965 to 1990, not one was black. And there is no indication the Bossier Parish system produced a black foreman at any time before 1965.

■ Bossier Parish's mere 20% black population may make the under representation less egregious than in many reported cases, where the minority population has often been 40% to 50%. But the lower black population does not provide a legal excuse for 0 black foremen of 50 chosen. If, consistent with the population distribution, 20% of the foremen chosen were black, that would have produced 10 black foremen. A mere 10% black representation would result in 5 black foremen. Even 5% yields a probability of 2.5 black foremen over the 25 years. Instead, we have zero. That is under representation by any measure. "Statistics are not, of course, the whole answer, but nothing is as emphatic as zero." *Guice I*, 661 F.2d at 505. Under representation has, as the State concedes, been established.[3]

### G. Susceptibility to Abuse

■ The third element (also conceded by the State) is whether the selection procedure employed was susceptible to abuse or not racially neutral. Once that element is met, Petitioner has established a prima facie case. That prima facie case may be rebutted by evidence that objective, racially neutral criteria were used in the selection process. *Johnson*, 929 F.2d at 1072–73. Many of the facts discussed under this heading as relevant to element three will also be relevant to and will be considered in connection with the State's attempt to rebut the prima facie case.

■ At the time Petitioner was indicted, the longstanding rule in Louisiana was that a judge selected a member of the grand jury venire and made that person both a voting member of the grand jury and the foreman. The other eleven members were then selected by lot. *See Campbell v. Louisiana*, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998)(describing process). Because of cases like *Campbell*, Louisiana law has since been amended to provide for the selection of the foreman by random selection. La.C.Cr.P. art 413. It is, therefore, hoped that this case will be the last before this court of the many foreman-related petitions that arose under the old law.

The 26th Judicial District Court is a two-parish district that includes Bossier and Webster parishes. Each parish has its own courthouse, clerk of court, and district attorney. Grand juries are empaneled separately in each parish. Judges, however, are elected to serve throughout

---

3. It is unknown how many opportunities were presented during those years to select a black foreman. It may be that some of the venires drawn did not include a black member. The district attorney does not, however, contend that that was ever the case, and *Castaneda* does not indicate that it would make a difference.

the district. At the time of Petitioner's prosecution, the district had five judges. A sixth judge has since been added. There has never been a judge elected in the 26th JDC who was not white.

Judge Kitchens, who is white, testified at the hearing about the process that he used to select grand jury foremen in Bossier Parish. The parties stipulated that the procedure described by Judge Kitchens was also used by his fellow judges. Records indicate that Judge Kitchens empaneled Petitioner's grand jury in September of 1989. He had no independent recollection of exactly what he did in that instance, but he fully explained his ordinary practice. He gave no indication the ordinary practice was not followed in Petitioner's case.

Judge Kitchens testified that he took the bench in 1978. Two Bossier Parish grand juries are ordinarily selected each year, with one empaneled in the spring and the other in the fall. It has been the practice of the court to have the judge assigned to Courtroom A during the week a grand jury is empaneled select the foreman and perform the other tasks associated with empaneling the grand jury.

Judge Kitchens testified that on the first two occasions he was called upon to select a foreman, District Attorney Henry Brown suggested a name to him. He soon decided to remove the prosecutor from the decisionmaking process by not consulting him and, furthermore, intentionally not selecting as foreman any person the prosecutor recommended. Prior to seeing the venire, Judge Kitchens would be provided a list of the names and addresses of the 35 persons on the venire. The lists did not indicate the race of the venire members. The judge would review the list to see if he recognized someone who would make a good foreman.

Judge Kitchens is from Webster Parish, so he did not know many Bossier Parish citizens. Accordingly, he regularly reviewed the list with Clerk of Court Wilna Mabry (now deceased) who was a longtime political figure in Bossier Parish and knew many of its citizens. Judge Kitchens said he looked for a "responsible person" with a measure of leadership skills and education. He also considered the person's occupation. Much of that information would be obtained from Ms. Mabry. If neither he nor Ms. Mabry knew a person, that person would not be considered for the foreman post. Judge Kitchens and all his fellow judges during the relevant time (and to this day) were white. Ms. Mabry, Mr. Brown, and their successors in office were also white.

The judge would then select a person whom he believed would make a good foreman and ask the bailiff to bring the person to his office. The judge would then ask the prospective foreman if he (or she) had a good reason he could not serve as foreman. That meeting would be the first time at which the judge would be able to observe the foreman's race. The race of the person was, however, quite likely already known or suspected because the judge selected only persons he knew or who were known to Ms. Mabry and had been discussed by Ms. Mabry and the judge.[4]

4. Even though the race of the jurors was not mentioned on the list, mere names and addresses would be a dead giveaway to the race of many people. This is true in any community, but especially in a small and largely segregated area. See Castaneda, 97 S.Ct. at 1280 (selection procedure not racially neutral with respect to Mexican–Americans because Spanish surnames were easily identifiable.) Obviously, black surnames are not as easily identifiable as Spanish surnames, but in small areas like Bossier Parish certain names (and addresses) are easily identifiable as belonging to a particular white or black family. Judge

There were 35 venire members assembled for selection of the grand jury that indicted Petitioner. The court records did not list the races of the persons assembled, but the race of some of them can be determined by cross-checking the records of the registrar of voters, whose records do include information on race. The current voter records do not, however, contain information on all the persons on the 1989 list. It appears information is no longer available for those persons who have since died, moved or otherwise been dropped from the voter rolls. Counsel were able to learn the race of 22 of the 35 persons on the venire. Of those 22, only two were black, and one of the two black veniremen was disqualified from service because he was a convicted felon.

Judge Kitchens first selected from those 35 persons Ms. Ann Mattis, a white female, to be a member of the 12–person grand jury and serve as its foreman. He has no specific recollection of the September 1989 selection process or why he selected Ms. Mattis.

Petitioner has established that the selection procedure employed for several years leading up to his indictment was susceptible to abuse and was not race neutral. To the contrary, it was entirely subjective and open to influence by factors such as race. A group of white judges, influenced by the opinions of other white officials, selected persons whom they knew or recognized and whom they believed had good leadership qualities. That process lends itself to diminishing the chances that a black citizen will be selected as foreman. Decades of all-white foremen show that it did. Petitioner has, therefore, undoubtedly established a prima facie case of racial discrimi-

nation in the selection process of the grand jury foreman in Bossier Parish.

**Rebuttal By the State**

**A. In State Court**

At the post-conviction hearing in State court, the judge called for argument on the grand jury issue. He suggested that the issue would not be "testimonial intensive" because there was likely a stipulation as to the number of black foremen appointed in the past. Counsel for petitioner noted the lack of black foremen and argued that mere claims of good faith could not excuse the Parish's record. The prosecutor responded that there had been two black foremen appointed in Webster Parish (Webster Parish and Bossier Parish form the 26th JDC) and that by the time of the hearing there had been at least four black foremen for the 26th JDC "since about 1988 or '89." The judge recalled appointing one of those foremen in Webster Parish "in about '89 or '90, I think." (Tr. 182–83)

There was, however, no evidence of a black foreman appointed in Bossier Parish at any time between the beginning of the parish's existence and the time Petitioner was indicted. With respect to the recent appointment of black foremen in Webster Parish, it appears the appointments were made at about the same time as Petitioner's indictment or after, and the State cited no legal basis for considering statistics from the sister parish. (The parish at issue in *Guice* was part of a three-parish district, but the Fifth Circuit focused its inquiry on statistics from and the selection procedure employed in the parish where the indictment issued.)[5] The prosecutor

Kitchens testified that, as a Webster native, he was not familiar enough with Bossier Parish to guess race based on addresses. Ms. Ma-

bry, on the other hand, was very familiar with the area and its residents.

**5.** See *Guice v. Fortenberry*, 722 F.2d 276, 278 (5th Cir.1984) (*"Guice II"*).

also argued that Petitioner, as a white citizen, did not have standing to press the claim. Finally, he represented that the local judges had not made efforts to exclude blacks from service as a foreman. (Tr. 185–87)

After the hearing and the death of Petitioner's first post-conviction attorney, Petitioner's new attorney filed a supplemental brief (Tr.1975) that included plentiful census and public records information to further support Petitioner's claim that no black foreman had been appointed in the parish in at least the 15 years before his indictment. The brief also cited the then-recent *Campbell* decision that resolved the standing issue in Petitioner's favor. (Tr. 2003–04) With respect to the black persons who were said to have served as foreman in Webster Parish, counsel pointed out that only one of them served prior to the conclusion of Petitioner's trial. (Tr.2006) Finally, counsel observed that the prosecutor's conclusory affirmation of good faith by the local judges was insufficient, under federal jurisprudence, to overcome the prima facie case established by Petitioner's evidence. (Tr.2008)

The State filed a memorandum that characterized Petitioner's claim of discrimination as "ludicrous" and said Petitioner could not produce "one single thread of evidence" of discrimination, but the prosecutor did not point to any particular factual or legal basis to justify rejection of a prima facie case or that would rebut such a case. (Tr.2041–43) It was on this record that the State courts based their summary decisions that the claim lacked merit.

## B. In Federal Court

Despite Bossier Parish's record of not appointing minorities as foremen, the undersigned was persuaded by Judge Kitchens' testimony that he did not intentionally discriminate during the selection process.

His testimony was that of a credible and forthright judge who undertook his duties seriously and without regard to race or other discriminatory factors. Judge Kitchens explained that he was the first Bossier Parish judge to appoint a female as a grand jury foreman when he appointed a Ms. Stinson in 1979. When he learned that Ms. Stinson was the first female and that there had never been a black foreman, he talked to his fellow judges about the need for more diversity in foreman appointments. (Nonetheless, at least 11 more years passed without the selection of a black foreman.)

The undersigned finds that Judge Kitchens' testimony was credible and that he did not consciously or intentionally discriminate on the basis of race when he selected Ms. Mattis to serve as the foreman of Petitioner's grand jury. The question then becomes whether that finding is sufficient to rebut the presumption of unconstitutional action that was created by establishment of the prima facie case. A review of the relevant jurisprudence must precede the answer.

## C. Alexander v. Louisiana

 "Once a prima facie case of invidious discrimination is established, the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). The clerk of court who served as a member of the jury commission at issue in *Alexander* testified that no consideration was given to race during the grand jury procedure. The Supreme Court responded that it "has squarely held, however, that affirmations of good faith in making individual selections are insufficient to dispel a prima facie

case of systematic exclusion." *Id.* at 632, 92 S.Ct. 1221. It added that "[t]he result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual jury commissioner." *Id.*

The clerk's testimony in *Alexander* was deemed "not, in itself, adequate to meet the State's burden of proof" because the system employed presented the opportunity to discriminate at other stages of the process. *Alexander* is representative of a number of Supreme Court decisions in the grand jury discrimination field and how the Court analyzes the rebuttal case.

### D. Guice v. Fortenberry

The Fifth Circuit in *Guice II* applied the principles discussed in *Alexander.* The *Guice* petitioners established that none of the 31 foremen appointed in the several years prior to their indictments were non-white. In an attempt to rebut that prima facie case, the State presented Judge Adams, who had selected 28 of the 31 foremen, as its sole witness. He testified, much like other Louisiana trial judges have testified in this court, that his selection procedure was subjective and, for the most part, he relied on his personal knowledge of the qualifications of potential foremen. He only appointed persons with whom he was familiar. There was no evidence of any systematic attempt to obtain objective information about the qualifications of other venire members. The district court found that Judge Adams' testimony was credible and rebutted the prima facie case.

The Fifth Circuit disagreed with that result. It observed that the State is entitled to rebut the presumption, but: "To do so, it must show that the pattern of underrepresentation proved (no blacks appointed in 15 years) was the result of a 'racially neutral selection procedure.'" *Guice,* 722 F.2d at 280, quoting *Alexander,* 92 S.Ct. at

1226. The Fifth Circuit also noted *Alexander*'s statement that affirmations of good faith in making individual selections are insufficient to rebut the prima facie case. It went on to say, with regard to the Supreme Court's comments on such affirmations, that:

> The sweeping language of the relevant Supreme Court opinions does not foreclose the issue. A presumption of discriminatory conduct may be successfully rebutted by testimony of responsible public officials if that testimony establishes the use of racially neutral selection procedures.

*Guice,* 722 F.2d at 281 (emphasis added).

The question, then, was whether the testimony of Judge Adams rose to the level required to rebut the petitioners' case. The Fifth Circuit held that it did not because his testimony "reveals no objective criteria were used in his selection of grand jury foremen; rather, he selected individuals, always white, who were known to him." *Id.* Judge Adams' testimony that the persons he appointed were the best qualified was dismissed because he had made no inquiries regarding the qualifications of venire members he did not know. Again noting the lack of "objective criteria or guidelines" for selecting foremen, the Fifth Circuit held that the testimony of Judge Adams was inadequate to overcome the presumption of discrimination. Notably, the district court's acceptance of the testimony as credible was not overturned. The testimony was instead found legally insufficient due to the lack of objective guidelines.

The Fifth Circuit, following the *Guice* decisions, also reversed a district court and ordered habeas relief in *Johnson v. Puckett,* 929 F.2d 1067, 1073 (5th Cir.1991) when the rebuttal testimony indicated that the judges for the county never indicated to the clerk that they selected foremen

based on race. The testimony neither denied the use of racial criteria nor advanced any other objective non-discriminatory criteria used by the judges.

### E. Guillory v. Cain

Based on the undersigned's appreciation of the above-described jurisprudence, relief was recommended in *Hicks* (from Bossier Parish) and a similar case from Bienville Parish even though the undersigned found credible the testimony of the judges who testified in those cases (Judge Burchett from Bossier and Judge Burgess from Bienville) that they did not intentionally or consciously discriminate in the selection of foremen. The absence of evidence of racially neutral, objective selection procedures or criteria was found to preclude the State from rebutting the prima facie case with only affirmations from the judges of the appointing court.

That understanding had to be reexamined after *Guillory v. Cain*, 303 F.3d 647 (5th Cir.2002), which says: "We do not read *Guice* to hold that the sole means of rebutting a prima facie case is proof that racially neutral procedures have been independently adopted." But the *Guillory* Court added: "That may well be the case when the only rebuttal of the prima facie case is a denial from the official whose decisions created it." *Id.* at 652.

The facts in *Guillory* are unique and must be reviewed to determine its impact on this case. The State accepted that the petitioner could establish a prima facie case. Judge Carter, who appointed the foreman in the case at issue, was black, appointed the foreman as his first selection, and had appointed only three foremen by the time of the habeas hearing. That short track record was deemed statistically insufficient to support an inference of intentional discrimination.

Judge Carter testified that he tried to select a foreman who would be fair and independent and would not necessarily go along with the prosecutor. He denied that race was a factor in his selection of a white male as the foreman of the grand jury that indicted Mr. Guillory. He explained that he knew the person and was familiar with his education and reputation. Although Judge Carter made other statements that indicated gender and race bias, the Fifth Circuit was persuaded that the magistrate judge's finding that Judge Carter selected the foreman because of his education and reputation, and not because of race, was not clearly erroneous.

The Court reasoned that the flawed system that lacked objective criteria had resulted in the parish's record and the prima facie case. "But that doesn't answer the ultimate question of whether this selection was the product of intentional discrimination." *Guillory*, 303 F.3d at 651. Given the magistrate judge's credibility finding and Judge Carter's appointment of black foremen in his next two opportunities, the court also affirmed the magistrate judge's ultimate legal conclusion that "in this case the flawed system did not produce a selection that was the product of intentional discrimination." *Id.* at 652.

### F. Federal Evidentiary Hearing

"If the applicant has failed to develop the factual basis of a claim in State court proceedings," the federal court "shall not hold an evidentiary hearing" unless the petitioner makes certain showings that this applicant cannot make. 28 U.S.C. § 2254(e)(2). This applicant did not, however, fail to develop the factual basis of his claim while in State court. His counsel filed several affidavits and exhibits concerning the history of the selection of Bossier Parish grand jury foremen and the race of those selected. He also fully

briefed the factual and legal issues related to the foreman claims. (Tr.1975–2040) There was certainly no lack of diligence, nor any greater fault attributable to Petitioner, as would be required to preclude a federal hearing pursuant to the statute. *Michael Williams v. Taylor,* 529 U.S. 420, 120 S.Ct. 1479, 1488, 146 L.Ed.2d 435 (2000). Given the lack of a § 2254(e)(2) bar on a hearing, the court was authorized to hold one pursuant to Rule 8(a) of the Rules Governing § 2254 Cases.

The State did not object to the hearing and can claim no prejudice stemming from it. The historical facts presented by Petitioner in support of his prima facie case were already in the State court record. The only new evidence was the testimony of Judge Kitchens, which benefitted the State by providing it a possible basis for rebutting the Petitioner's case.

### G. Standard of Review

Section 2254(d)(1) provides that a federal court may not grant habeas relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

■■■■ Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court (1) arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) decided the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). Under the "unreasonable application" clause—the clause that applies to most claims—a federal court is permitted to grant the writ if the state

court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. *Williams,* 120 S.Ct. at 1523.

■■■■ Even if the federal court finds in its independent judgment that the State court was incorrect in its application of a federal constitutional principle, that alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the State court decision was "not only erroneous, but objectively unreasonable." *Yarborough v. Gentry,* 540 U.S. 1, 124 S.Ct. 1, 4, 157 L.Ed.2d 1 (2003); *Cotton v. Cockrell,* 343 F.3d at 750.

■■■■ A federal habeas court only reviews the reasonableness of the state court's ultimate decision, so the inquiry is not altered when the State court does not, as in this case, provide reasons for its decision. *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir.2003). In such a situation, the federal court: (1) assumes that the state court applied the proper "clearly established Federal law"; and (2) then determines whether its decision was "contrary to" or "an objectively unreasonable application of" that law. *Id.*

■■■■ When the federal court holds an evidentiary hearing, the additional evidence is relevant, but deference to the State court's decision is still due. "Where a district court elects, in instances not barred by § 2254(e)(2), to hold an evidentiary hearing, the hearing may assist the district court in ascertaining whether the state court reached an unreasonable determination under either § 2254(d)(1) or (d)(2)." *Valdez v. Cockrell,* 274 F.3d 941, 952 (5th Cir.2001), *cert. denied,* 537 U.S. 883, 123 S.Ct. 106, 154 L.Ed.2d 141 (2002).

### H. Conclusion

■■■■ Although *Guillory* gives the court pause, the undersigned ultimately finds

that the unique facts in that case do not permit the denial of relief in this case even though the undersigned found credible Judge Kitchens' affirmation that he did not intend to discriminate on the basis of race. He was not a new judge, and he did not establish a track record (like Judge Carter) distinct from the record of the judges who created the prima facie case. There was no evidence of objective criteria known in advance of the selection, nor were there the unique facts like presented in *Guillory*, where the judge involved was himself an African–American. Rather, there was only an affirmation of good faith that, even when accepted by district courts in *Guice* and *Johnson*, the Fifth Circuit found so unsatisfactory as to reverse those district court judgments.

The standard of review is quite deferential, but there is no valid basis to support the State court's rejection of Petitioner's claim when Petitioner offered undisputed evidence that Bossier Parish, with a 20% black population and employing an entirely subjective appointment procedure, appointed zero black foremen between 1965 and 1989. That evidence (the State now concedes) established a prima facie case under *Castaneda* (the relevant "clearly established Federal law") and its progeny, and the State presented no evidence (in the State court proceedings) to rebut that case. When the decision is assessed in light of the record the State court had before it, as required in a no-federal-hearing case by *Holland v. Jackson*, 542 U.S. 649, 124 S.Ct. 2736, 159 L.Ed.2d 683 (2004), it is both incorrect and an objectively unreasonable application of *Castaneda, Campbell* and related Supreme Court precedent.

When the decision is reviewed with the benefit of the evidence the State submitted at the federal hearing, the same result must obtain. The Supreme Court prece-dents in· this field compel that relief be granted on this issue despite the lack of prejudice to the Petitioner and the overwhelming evidence of his guilt. Fifth Circuit precedent, although now of reduced importance under the AEDPA, has interpreted and applied the relevant Supreme Court decisions in this area in a fashion that also indicates relief must be granted.

**Ineffective Assistance of Counsel: No · Motion to Quash**

Although the undersigned's recommendation on the above issue, if accepted, would render moot Petitioner's ineffective assistance claim, that claim will be analyzed in the event a reviewing judge or court should decide relief on the foreman claim is not warranted.

▇▇▇ Petitioner argues that his attorneys rendered ineffective assistance when they failed to file a timely motion to quash the indictment on the grounds of discrimination in the selection of the foreperson. Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). A federal court may not grant habeas relief on a *Strickland* claim that was denied on the merits by the state court unless the state court's decision was an "unreasonable application" of *Strickland.* 28 U.S.C. § 2254(d); *Williams,* 120 S.Ct. at 1523.

This court cannot say that the State courts were unreasonable to determine that Petitioner's attorneys did not render constitutionally deficient performance by their omission of a motion to quash. Petitioner's standing to assert such a motion was not then recognized by Louisiana law, and it would be more than five years after the trial before the U.S. Supreme Court would squarely recognize that standing in *Campbell.* Counsel were sensitive to the

race issue, shown by their *Batson/Powers* objections at trial and on appeal. The State court was not unreasonable for failing to find counsel constitutionally deficient because they were not also prescient enough to forecast *Campbell*. *Meanes v. Johnson*, 138 F.3d 1007, 1012 (5th Cir.1998)(counsel need not pursue an issue that "would have been futile in light of existing state law and the right was not clearly established under federal law"); *Lucas v. Johnson*, 132 F.3d 1069, 1078–79 (5th Cir.1998) ("counsel is not required to anticipate subsequent developments in the law").

Granted, the jurisprudence now says *Campbell* did not announce a new rule, but it was not obvious to all reasonable attorneys at the time of Petitioner's indictment that white defendants had standing on the foreman issue. When Terry Campbell made the argument to the Supreme Court of Louisiana in 1995 (3 years *after* Petitioner's conviction was final), the Court ruled against him 6–1. The lone dissenting justice's sole objection was that the record was inadequate to decide the issues. It was not until Mr. Campbell took his case to the United States Supreme Court in 1998 that it became express in the jurisprudence that a white citizen has standing to assert an equal protection challenge to the foreman selection process. When all members of the Supreme Court of Louisiana missed the issue, it is difficult to hold that an attorney failed to perform at the constitutional minimum level when he did not recognize the issue and file a motion to quash. It is even more difficult to conclude that the state court's resolution of the issue on post-conviction application was objectively unreasonable.

Furthermore, counsel in a time-demanding capital case have to allocate their limited time and resources to those issues they believe have the best potential to avoid a conviction or sentence of death. Counsel could certainly have made a reasonable strategic decision to direct their efforts toward an issue other than a claim that had not yet been expressly recognized by the Louisiana or federal courts and that could be cured by the simple issuance of an easily obtained new indictment from a different grand jury.

■ This claim also fails on the prejudice prong of *Strickland*. Although prejudice need not be shown to prevail on a claim that an indictment is tainted by racial prejudice in the selection of the grand jury, that does not relieve the Petitioner from proving prejudice on a related *Strickland* claim. *Pickney v. Cain*, 337 F.3d 542, 546 (5th Cir.2003). The failure to file a motion to quash the indictment (issued on a finding of probable cause) does not undermine confidence in the outcome of the trial (where a legally chosen petit jury found proof of guilt beyond a reasonable doubt). The evidence of guilt in this case was overwhelming. Prejudice, therefore, is not present on this *Strickland* claim. *See Pickney* (rejecting similar *Strickland* claim for lack of prejudice).

### The Remedy

■ A federal habeas judge who determines that relief is warranted ordinarily does not order the immediate release of a prisoner. Instead, he grants a conditional release order which provides for release of the petitioner after a reasonable time unless the State either retries the petitioner or otherwise corrects the constitutional violation. The practice was described in *Smith v. Lucas*, 9 F.3d 359, 366–67 (5th Cir.1993) as follows:

> In the conditional writ cases, the federal court has determined that it has the authority to order immediate release of the prisoner as a result of the federal law violation; the court chooses, howev-

er, to delay the writ to allow the state to correct the problem as best it can. Although the federal court, in doing so, may certainly suggest a corrective procedure in broad terms, the real thrust of the order is to alert the state court to the constitutional problem and notify it that the infirmity must be remedied.

■ A new indictment and trial are the only apparent means of remedying this violation.[6] That was recognized in *Guice II*, which directed the district court to "issue writs of habeas corpus setting aside the indictments and the convictions of the petitioners, but providing, of course, that, the state may, within a reasonable period of time, seek to reindict the petitioners, and, if they are reindicted, seek to convict them." 722 F.2d at 282. *See also Johnson*, 929 F.2d at 1073 (remanding with instructions to "issue the writ of habeas corpus unless, within a reasonable time to be designated by the district court, the State should again indict and try Johnson").

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be conditionally granted by (1) vacating the indictment and conviction of Petitioner and (2) ordering that Petitioner be released from custody unless the State, within a reasonable time, obtains a new indictment or otherwise institutes a prosecution of Petitioner

arising from the facts that resulted in his initial conviction.

### *Objections*

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ. Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed.R.Civ.P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See Douglass v. U.S.A.A.*, 79 F.3d 1415 (5th Cir.1996) (en banc).

Aug. 6, 2004.

---

**6.** Petitioner faced the death penalty at his first trial. He received a mandatory life sentence from the court because the jury could not unanimously agree on a penalty. By asking for a new trial in this habeas petition, Petitioner exposes himself to the risk of a death sentence at a second trial. Federal law principles of Double Jeopardy or Due Process will not prevent the State from obtaining a death sentence when the original jury was hung on the sentencing issue. *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d

588 (2003). The Supreme Court of Louisiana has, however, held that giving the prosecution another chance at the death penalty in these circumstances would unduly impair or chill the policies underlying the right to appeal guaranteed by the Louisiana constitution. *State v. Washington*, 380 So.2d 64 (La.1980). Of course, there is no guarantee the modern Supreme Court of Louisiana will adhere to that 24 year old decision. Petitioner will, therefore, face some risk of a death sentence if he insists on a new trial.